**N L INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 75–1714.

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1976.

Decided June 9, 1976.

Edward F. Ryan, Carpenter, Bennett & Morrissey, Newark, N. J., for petitioner; Irving L. Hurwitz, Newark, N. J., on brief.

Anne Libbin, Atty., N. L. R. B., Washington, D. C., for respondent; John S. Irving, Jr., Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert A. Giannasi, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., on brief.

Before LAY, ROSS and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

The issue before us is whether the NLRB properly found that a union did not waive its right to require an employer to bargain, during the term of the present collective bargaining agreement, regarding an employee savings plan. We find substantial evidence on the record as a whole to support that finding and accordingly enforce the Board's order.

N L Industries is engaged in the manufacture, sale and distribution of titanium pigments and related products and operates a titanium plant in St. Louis, Missouri. There are three unions at N L Industries' plant in St. Louis. Local 1744, the charging party here, is the largest, representing approximately 800 production and maintenance workers. In 1944, the company adopted a profit-sharing plan for its office and salaried employees, who were represented by Local 5–225. Before 1973, Local

1744 had unsuccessfully sought inclusion of its members in the profit-sharing plan. However, while negotiating a three-year contract in 1973, Local 1744 representatives asked only for a stock-purchase plan for the employees. The request for the stock-purchase plan was dropped during negotiations and the 1973 collective bargaining agreement provided no such benefits.

In January 1974, the company significantly changed its profit-sharing plan to allow covered employees to initiate company contributions by voluntary individual payments. When Local 1744 learned of the new benefits provided the office workers, it requested the company to bargain on inclusion of the production and maintenance employees in the new plan. The company refused and on June 27, 1974, the union filed an unfair practice charge against the company alleging violation of § 8(a)(1) and (5) of the Labor Management Relations Act.

After an evidentiary hearing, the Administrative Law Judge found that the old profit-sharing plan had not been discussed during the negotiations for the 1973 contract. He further found that the amended

plan provided new benefits and was thus dissimilar to the old plan. On those facts, he held that the union could not be held to have waived bargaining over something which was not in existence at the time of the 1973 negotiations, citing *B. F. Goodrich Co.*, 79 L.R.R.M. 1563 (1972).

The Board adopted the findings and conclusion of the Administrative Law Judge and entered an order requiring the company to bargain with Local 1744 under § 8(a)(1) and (5) of the Act.

There is substantial evidence on the record as a whole to support the Board's finding that the union did not waive its right to bargain. At the time of the negotiations for the 1973 contract, neither the union nor the company knew that an amended profit-sharing plan would be adopted. The parties could not have contemplated this amended plan as a bargaining subject. The original plan's earnings had shown a downward trend and the union did not even attempt to negotiate for it. This conduct fails to demonstrate any "conscious relinquishment" of a new savings plan with a clearly enhanced value to the included employees.[1] It is settled law that

---

1. In January 1974, the company distributed a leaflet setting forth the new changes to the

profit-sharing plan which reads as follows:

CHANGES ARE BEING MADE . . . IN YOUR NL INDUSTRIES RETIREMENT AND PROFIT-SHARING PLANS

---

BRIEFLY, HERE'S WHAT'S HAPPENING . . .

1 Employees will no longer be required to contribute to their retirement plan benefits.
2 The retirement plan's definition of final average pay is being liberalized. For most employees, this will mean a substantial increase in plan benefits at retirement.
3 We're re-structuring the plan's benefit formula so that plan benefits and Social Security coordinate *automatically*. (For many years, we've been doing the same thing through periodic updates of our formula.)
4 Because profit-sharing contributions aren't ever expected to return to the level we enjoyed in the 1960's, we're amending the plan to make it an employee *savings* plan. Com-

pany contributions will now depend on what you put in—not on Company profits.
5 Under the new savings plan, you can make two kinds of contributions—basic and supplemental. Basic contributions are added to by the Company. Supplemental contributions allow you to put additional money into the savings plan's investment funds for possible tax-sheltered growth.
6 You can change your rate of savings plan contributions—or stop them altogether—at any time. You can change the way your past contributions have been allocated as often as once a year.

any waiver of the statutory right to bargain over a mandatory subject of bargaining must be in "clear and unmistakable language." *See NLRB v. R. L. Sweet Lumber Co.*, 515 F.2d 785 (10th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302, 44 U.S.L.W. 3305 (1975); *Murphy Diesel Co. v. NLRB*, 454 F.2d 303, 306–07 (7th Cir. 1971); *General Electric Co. v. NLRB*, 414 F.2d 918 (4th Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970). As the Administrative Law Judge found, the new plan was "far more than the old Profit-Sharing Plan operating under a new name."

The company's defense is that § 8(d) of the Act absolves them of the duty to bargain regarding the profit-sharing plan during the term of the contract.[2] In support of this claim the company relies on *NLRB v. Nash-Finch Co.*, 211 F.2d 622 (8th Cir. 1954). There, this court found that once the parties had entered into a collective bargaining agreement, the union had waived its right to bargain further over matters negotiated upon. In *Nash-Finch* the union had specifically bargained over certain benefits under a hospital insurance plan, as well as Christmas bonuses, but in final negotiation these requests were dropped and did not appear in the collective bargaining agreement. The facts in the present case are clearly distinguishable from *Nash-Finch*. Here, the union at no time requested inclusion in either the old profit-sharing plan or the new one during the 1973 negotiations. There was no "give and take" in the negotiations, and therefore no waiver.

Absent waiver manifested either by the terms of the contract or by actual negotiation, the Act requires bargaining upon request on a mandatory subject during the term of a contract. *See NLRB v. Jacobs Mfg. Co.*, 196 F.2d 680 (2nd Cir. 1952). In *Jacobs* the Second Circuit recognized:

> The purpose of [§ 8(d)] is, apparently, to give stability to agreements governing industrial relations. But, the exception thus created necessarily conflicts with *the general purpose of the Act, which is to require employers to bargain as to employee demands whenever made* to the end that industrial disputes may be resolved peacefully without resort to drastic measures likely to have an injurious effect upon commerce, and the general purpose should be given effect to the extent there is no contrary provision. Since the language chosen to describe this exception is precise and explicit, "terms and conditions contained in a contract for a fixed period," we do not think it relieves an employer of the duty to bargain as to subjects which were neither discussed nor embodied in any of the terms and conditions of the contract. Therefore, we hold that it was the respondent's statutory duty to bargain on the subject of pensions.

196 F.2d at 684.

The precise issue presented in *Jacobs* has arisen on infrequent occasion.[3] This

---

7  You get the full value of your savings plan account when you retire, if you become disabled, or at death. While you're an active employee, you can withdraw part of your account (subject to certain priorities and qualifications).

These are the seven major areas of change. *The rest of this folder describes them in greater detail.*

**2.** Section 8(d) provides in part:

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel *either party to agree to a proposal or require the making of a concession: Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall *terminate or modify such contract.* . . .

29 U.S.C. § 158(d).

**3.** The Board has uniformly interpreted § 8(d) to require mid-term bargaining on mandatory subjects. *Huttig Sash & Door Co.*, 60 L.R.R.M. 1035 (1965), *enforced*, 377 F.2d 964 (8th Cir. 1967); *Fibreboard Paper Products Corp.*, 47

**790**

may be due to the fact that most collective bargaining agreements today contain grievance mechanisms culminating in binding arbitration. Moreover, the Supreme Court in *NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952), upheld the right of the parties to engage in "hard" bargaining, that is, bargaining to impasse. Thus, the duty to bargain is not a duty to capitulate. As in *Jacobs*, the only effect of the Board's order here is to require the company to bargain in good faith on the subject matter involved.[4]

█ The *Jacobs* case requires bargaining over mandatory subjects during the term of the contract unless the contract expressly dealt with the subject matter. *Nash-Finch* resolved the unanswered question in *Jacobs* by holding that when the right to bargain has been clearly and unmistakably waived there is no duty to bargain during the term of the contract. We adhere to the *Jacobs* and *Nash-Finch* reconciliation of the conflicting policies embodied in §§ 8(a)(5) and 8(d), as consistent with the goals of the Act. Section 8(a)(5) recognizes the need for flexibility in contract negotiations and the desirability of continued bargaining to maintain industrial peace. Section 8(d), on the other hand, supports contract stability by providing that there is no mid-term duty to bargain over subjects included in the terms and conditions of the contract. However, § 8(d) does not relieve the parties of the duty to bargain over matters not previously negotiated or covered in their contract. A contrary interpretation would be inimical to industrial peace. *See* Wollett, *The Duty to Bargain Over the "Unwritten" Terms and Conditions of Employment*, 36 Tex.L.Rev. 863 (1958).[5]

The company's petition for review is denied and the order of the Board is enforced.

---

L.R.R.M. 1547 (1961), *enforced*, 116 U.S.App. D.C. 198, 322 F.2d 411 (D.C.Cir. 1963), *aff'd*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). *Tide Water Associated Oil Co.*, 24 L.R.R.M. 1518 (1949).

Decisions of the Court of Appeals have generally concerned bargaining orders on unilateral changes and the question whether the union had waived its rights to bargaining regarding the change. *See, e. g., NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. R. L. Sweet Lumber Co.*, 515 F.2d 785 (10th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302, 44 U.S.L.W. 3305 (1975); *NLRB v. Raven Industries, Inc.*, 508 F.2d 1289 (8th Cir. 1974); *Murphy Diesel Co. v. NLRB*, 454 F.2d 303 (7th Cir. 1971); *NLRB v. Wisconsin Aluminum Foundry Co.*, 440 F.2d 393 (7th Cir. 1971); *NLRB v. General Electric Co.*, 418 F.2d 736 (2nd Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

4. We do not understand this part of the order to require the respondent to do more than show its good faith in bargaining collectively. . . . He is left free to decide . . .

and, at the end of the bargaining, may agree only insofar as he is willing in the light of all the circumstances.

196 F.2d at 684.

5. Changing economics, working conditions, new plant and new machine technology necessitate systematic procedures for discussion of changes during the term of a bargaining agreement. Both labor and management favor contract stability through longer terms in the bargaining agreements, and this policy is enhanced by assurance of flexibility for future contingencies. Many companies and unions have adopted techniques such as "preventive mediation" —a voluntary process in which the parties continuously and on an on-going basis examine their relationship. *Labor Relations Yearbook—1972 at 130.* "*Continuous bargaining techniques*" *are also employed to establish and preserve continuity in the bargaining relationship.* See Labor Relations Yearbook—1971 at *116. These contractual approaches attest to the soundness of the fundamental policy behind 8(d) and the* Jacobs *decision.*